## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                      No. 20-CR-01903 MV

JOSE PENA,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Mr. Pena's Motion to Suppress Statements.  Doc. 51.  The government filed a response on March 4, 2022 [Doc. 54], and Mr. Pena filed a reply on March 18, 2022 [Doc. 66].  The Court held a hearing on the Motion on April 1, 2022 and ordered additional briefing.  Doc. 93.  On April 11, 2022, Mr. Pena and the government filed additional briefs on the Motion.  Docs. 97–98.  Having carefully considered the briefs, testimony, and relevant law, and being otherwise fully informed, the Court finds that the Motion is not well-considered and will be **DENIED**.

### BACKGROUND

Mr. Pena was charged by indictment on October 16, 2020 on eight counts of Production of Visual Depictions of a Minor Engaging in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2251(a), 2251(e), and 2256.  Doc. 1.  On June 9, 2021, a Superseding Indictment was filed, charging Mr. Pena with one count of Coercion and Enticement, in violation of 18 U.S.C. § 2422(b), as well as eight counts of Production of Visual Depictions of a Minor Engaging in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2251(a), 2251(e), and 2256.  Doc. 32.  On April 13, 2022, a Second Superseding Indictment was filed charging Mr. Pena with one count of Coercion

and Enticement, in violation of 18 U.S.C. § 2422(b), and two counts of Production of Visual Depictions of a Minor Engaging in Sexually Explicit Conduct, in violation of 18 U.S.C. §§ 2251(a), 2251(e), and 2256.  Doc. 103.  He is accused of coercing or enticing his minor daughter into having sexual contact with him and recording that contact.

In the instant Motion to Suppress Statements, Mr. Pena argues that his oral statements, made in an interrogation with the Sandoval County Sheriff's Department, were involuntarily made. Doc. 51 at 1.  Mr. Pena argues that his statements were involuntary because police engaged in coercive activity and because, due to his unique characteristics, he was particularly susceptible to coercion.  Docs. 51, 66, 97.

The government responds that "officers' actions from the inception of their interview with Defendant, and throughout each stage of the interview, were reasonable, lawful, and produced voluntary statements consistent with the Fifth Amendment."  Doc. 54 at 4; *see also* Doc. 98.

## LEGAL STANDARD

"When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt."  *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002).  "To be admiss[i]ble, a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort."  *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993). The central question is whether the confession is "the product of an essentially free and unconstrained choice by its maker."  *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993). "[I]f his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."  *Id.*

2

The Tenth Circuit "determines the voluntariness of a confession based upon the totality of the circumstances, considering both the characteristics of the accused and the details of the interrogation." *Toles*, 297 F.3d at 965–66.  This test "does not favor any one of these factors over the others—it is a case-specific inquiry where the importance of any given factor can vary in each situation." *Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015).  However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Additionally, "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Id.* at 164.  Other relevant factors "include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; . . . (5) whether the defendant was subject to physical punishment[;]" and (6) "the location of the interrogation."  *United States v. Lopez*, 437 F.3d 1059, 1063–64 (10th Cir. 2006) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *Perdue*, 8 F.3d at 1466.

## DISCUSSION

### 1.  Coercive Police Activity

Courts must first address whether there was coercive police activity.  *See Connelly*, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'").  Whether police activity was coercive depends on the nature and length of questioning, as well as whether the defendant was advised of his *Miranda* rights or was subject to physical punishment.  *See Lopez*, 437 F.3d at 1063–64.

### a.  Waiver of *Miranda* Rights

#### i.  Custody Determination

Mr. Pena argues that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.  Doc. 97 at 5.  This argument hinges on whether Mr. Pena was in custody, because "*Miranda* rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"  *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008).  Thus, if Mr. Pena was not in custody, it would not matter whether his *Miranda* waiver was invalid.

Mr. Pena asserts that "[t]here is no doubt that [he] was in custody at the time of his statements."  Doc. 66 at 6.  The government responds that it "was not a custodial interrogation," but rather was "a consensual encounter with Sergeant Rodriguez."  Doc. 98 at 4, 10.

"An individual is in custody of the authorities under *Miranda* if he is deprived of his freedom of action in any significant way, or his freedom of action is curtailed to a degree associated with formal arrest."  *Chee*, 514 F.3d at 1112 (quotations and citations omitted).  The determination therefore hinges on whether "a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest."  *Id.*  This fact-intensive inquiry focuses on the totality of the circumstances, including: (1) whether the suspect is informed that they are "free to refrain from answering questions"; (2) whether the suspect is informed that they are free "to end the interview at will"; (3) "whether the questioning is prolonged and accusatory"; and (4) "whether the environment was 'police dominated.'"  *Id.* at 1112–13.  Indicators of a police-dominated environment include: (1) a suspect's isolation from their family; (2) isolation "in a nonpublic questioning room"; (3) "the threatening presence of several officers"; (4) "any display

4

of weapons"; (5) "physical contact with the suspect"; and (6) an officer's language or tone indicating "that compliance might be compelled." *Id.* at 1113.

Based on the totality of the circumstances, the Court finds that Mr. Pena was in custody for purposes of *Miranda*. First, the questioning was "prolonged and accusatory." *Id.* Sergeant Rodriguez questioned Mr. Pena in a loud and accusatory tone for nearly four hours, demanding that Mr. Pena tell the truth and claiming that he had irrefutable evidence of Mr. Pena's guilt. *See* Doc. 54-1. Additionally, there are many indicators that the questioning occurred in a police-dominated environment. *See Chee*, 514 F.3d at 1113. Although Mr. Pena came to the police station voluntarily, he was immediately separated from his wife and isolated in a nonpublic questioning room. *See* Doc. 54-1; Doc. 54-2 at 6–7. Over the course of the interview, multiple officers took part in the questioning, with as many as three officers in the six by ten-foot room at once. *See* Doc. 54-1. Sergeant Rodriguez wore a police uniform and displayed his weapon at all times. *See* Doc. 54-1; Doc. 95 at 19:8–9. Although he did not make physical contact with the suspect, Sergeant Rodriguez invaded Mr. Pena's personal space several times with hand gestures and by extending his legs between Mr. Pena's legs. *See* Doc. 54-1; Doc. 95 at 53:21–25—54:1–7, 54:18–25—55:1–23. Finally, Sergeant Rodriguez's language and tone indicated "that compliance might be compelled." *Chee*, 514 F.3d at 1113. Namely, Sergeant Rodriguez used a "much louder" tone of voice to exhort Mr. Pena to confess, using phrases like "be honest" and "tell the truth" nearly 100 times in four hours. *See* Doc. 54-2; Doc. 95 at 80:22–23. While this does not rise to outright coercion, the Court finds that these actions indicated that Mr. Pena's compliance in the interrogation "*might* be compelled." *Chee*, 514 F.3d at 1113 (emphasis added).

Of course, by playing the *Miranda* warning, Sergeant Rodriguez ensured that Mr. Pena was informed that he was "free to refrain from answering questions." *Id.* at 1112; Doc. 54-2 at 4

("You have the right to remain silent.").  Additionally, Sergeant Rodriguez informed Mr. Pena that

he was free "to end the interview at will."  *Chee*, 514 F.3d at 1112–13; Doc. 54-2 at 5–6 ("[I]f you

talk to me and decide that you don't want to talk anymore, you can stop talking and tell me.").

Nevertheless, when viewed as a whole, "a reasonable person in [Mr. Pena's] position

would have understood the situation as the functional equivalent of formal arrest."  *Chee*, 514 F.3d

at 1112.  Accordingly, the validity of Mr. Pena's waiver of his Fifth Amendment rights is material

to the Court's determination of whether there was coercive police activity.

### ii.  Validity of *Miranda* Waiver

Mr. Pena argues that Sergeant Rodriguez' misrepresentation about the nature of the

interview was sufficient to invalidate the waiver of his *Miranda* rights.  Doc. 97 at 7.  Specifically,

he argues that by telling Mr. Pena that he was not accused of anything, Sergeant Rodriguez "went

beyond mere emotionalism, trickery or confusion and passed the line into the sort of lying that

deprives a defendant 'of the knowledge essential to his ability to understand the nature of his rights

and the consequences of abandoning them.'"  *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 424

(1986)).  The government responds, arguing that Sergeant Rodriguez was not deceptive and that

he had no duty to inform Mr. Pena of the nature of the investigation or the potential charges and

consequences facing him.  Doc. 98 at 6–8.

As an initial matter, the Court notes that the parties do not dispute that Mr. Pena waived

his *Miranda* rights.  *See* Docs. 51, 54, 66, 97, 98.  Indeed, Sergeant Rodriguez played a recording

of the *Miranda* warning in Spanish and then reiterated Mr. Pena's rights upon his request.  Doc.

54-2 at 3–6.  Sergeant Rodriguez then asked Mr. Pena if he understood his rights and wished to

continue talking.  *See id.*  Mr. Pena repeatedly affirmed that he understood his *Miranda* rights.  *See*

*id.* at 6–8.  He also continued to talk with Sergeant Rodriguez.  *Id.*  Accordingly, the Court finds

6

that Mr. Pena expressly or impliedly waived his *Miranda* rights.  *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *United States v. Varela*, 576 F. App'x 771, 776 (10th Cir. 2014) (not reported).  Thus, the Court need only address whether Mr. Pena's *Miranda* waiver was valid.

A valid *Miranda* waiver has two characteristics.  First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *Moran*, 475 U.S. at 421.  Second, the waiver must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*  However, "the Constitution [does not] require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."  *Id.* at 422.

In *Colorado v. Spring*, the defendant argued on appeal that his *Miranda* waiver was invalid because "he was not informed that he would be questioned about [a] murder" at the time that law enforcement gave the *Miranda* warning.  479 U.S. 564, 569 (1987).  The Supreme Court ruled that "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."  *Id.* at 574.  By requiring police to inform a criminal suspect "that *anything* he says may be used against him," the *Miranda* warning conveys the broad and unqualified nature of the Fifth Amendment privilege against self-incrimination.  *Id.* at 577.  If anything, requiring law enforcement to state specific charges or consequences could lull criminal suspects into a false sense of security that inculpatory statements—unrelated to the stated charges or consequences—would not be used against them. *Id.*  Accordingly, the Supreme Court held "that a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."  *Id.*

However, while "mere silence by law enforcement officials as to the subject matter of an interrogation is [not] 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights," in certain circumstances "affirmative misrepresentations by the police [are] sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege." *Id.* at 576, 576 n.8.  For example, in *Lynumn v. Illinois*, the Supreme Court ruled that a confession was involuntary where police officers misled a criminal suspect into believing that they could have the Court "send [her] to jail for 10 years and take [her] children." 372 U.S. 528, 531–32 (1963).  Likewise, in *Spano v. New York*, the Supreme Court ruled that a confession was involuntary in part because a police officer who was a close friend to the criminal suspect misled the suspect into believing that he, the police officer, would lose his job and be unable to support his pregnant wife and three children unless the suspect confessed.  360 U.S. 315, 321–23 (1959) (finding "that petitioner's will was overborne by official pressure, fatigue and sympathy falsely aroused").  Finally in *Hopkins v. Cockrell*, the Fifth Circuit found a *Miranda* waiver invalid where a police officer misled a criminal suspect into believing that they were close friends, that the interview was confidential, and that if they spoke quietly the other police officers would not hear them—all after the suspect had been in custody for fifteen days and had been subject to eight previous interrogations.  325 F.3d 579, 584–85 (5th Cir. 2003).

Here, the Court rejects the government's argument that Sergeant Rodriguez did not engage in trickery.  In response to Mr. Pena's question, "[W]hat are you accusing me of?" Sergeant Rodriguez replied, "I'm not accusing you. . . . I'm not accusing you of anything right now."  Doc. 54-2 at 6.  He later claimed that this statement was meant to clarify that "it wasn't me accusing him of anything.  I wasn't the person that had made the allegation."  Doc. 95 at 23:12–14.  The government argues that Sergeant Rodriguez "was trying to draw the careful distinction between the victim's allegation and law enforcement's actions."  Doc. 98 at 7.  This argument is farcical,

at best.  Any reasonable person would interpret the statement "I'm not accusing you of anything" to mean "You are not being accused of anything," rather than "*I* am not accusing you of anything." Sergeant Rodriguez' conduct was misleading, improper, and incompatible with a criminal justice system that values truth and honesty.  Law enforcement should never engage in such deceitful behavior while giving a *Miranda* warning, particularly given the stakes of an involuntary confession in the era of mass incarceration.

Be that as it may, it does not appear that Sergeant Rodriguez' actions were egregious enough to invalidate Mr. Pena's *Miranda* waiver, in light of Supreme Court and Tenth Circuit precedent.  First, Sergeant Rodriguez followed each statement of "I'm not accusing you," with a reminder of Mr. Pena's privilege against self-incrimination and the consequences of waiving that privilege.  After the first affirmative misrepresentation, Sergeant Rodriguez stated, "[Y]ou are involved . . . in this investigation . . . [and] there is a possibility that you are going to say something that can (stammers) be against you."  Doc. 54-2 at 6.  After the second affirmative misrepresentation, Sergeant Rodriguez reiterated, "[W]hen any person talks to the police, they need to understand that . . . if you say something, the police can use that against you."  *Id.* at 7. Thus, even though Sergeant Rodriguez affirmatively misrepresented the nature of the encounter, his statements may have served "to make [Mr. Pena] more acutely aware . . . that he [was] not in the presence of persons acting solely in his interest."  *Miranda v. Arizona*, 384 U.S. 436, 469 (1966).

While this was hardly in the spirit of *Miranda*, this behavior does not rise to the level of trickery displayed in *Lynumn*, *Spano*, or *Hopkins*.  *See supra.*  Instead, Sergeant Rodriguez' actions appear to conform to the level of misrepresentation countenanced by Tenth Circuit precedent.  *See, e.g.*, *United States v. Unser*, 165 F.3d 755, 767 (10th Cir. 1999) (finding statements voluntary

where agents did not disclose that defendant "was the target of a criminal investigation and instead [led] him to believe that they were simply trying to assist him" in a related matter); *United States v. Dates*, 752 Fed. App'x. 570, 577 (10th Cir. 2018) (unpublished) (finding an encounter consensual where agents' false statements implied that they thought the defendant "was a putative victim of online identity fraud rather than a criminal suspect"). Accordingly, the Court has no choice but to find that Sergeant Rodriguez' actions—while objectionable—did not invalidate Mr. Pena's *Miranda* waiver.

### b. Nature of Questioning

#### i. Deception or Misrepresentation

Mr. Pena also argues that Sergeant Rodriguez' deceptive tactics are a factor showing that his confession was coerced. Doc. 51 at 2, 5; Doc. 66; Doc. 97. Though similar to his argument *supra*, Mr. Pena argues, here, that Sergeant Rodriguez' misrepresentations not only affected the validity of his *Miranda* waiver but tainted the entire four-hour interrogation, "fundamentally undermin[ing his] exercise of rational choice." Doc. 66 at 4. The government argues that "Sergeant Rodriguez did not lie," and that even if the Court found Sergeant Rodriguez' actions "dishonest or deceptive, it does not follow that the confession was involuntary." Doc. 54 at 9; Doc. 98 at 9.

The Tenth Circuit has ruled that "an officer's deceptions or misrepresentations may, but do not necessarily, render a confession coerced." *United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020). In *Young*, Agent Brown dramatically misrepresented the length of the sentence that the defendant faced, insinuated that the sentence depended primarily on the defendant's cooperation, and falsely claimed that he could speak directly to the federal judge about the defendant's cooperation. *Id.* at 943–44. In light of these actions, and in combination with his

promises of leniency, the Tenth Circuit found that "Agent Brown's conduct was coercive in nature." *Id.* at 946.

This is not to say that any deception or misrepresentation will render an interview coercive. For example, "[i]t is well-settled that a confession is not considered coerced merely because the police misrepresented to a suspect the strength of the evidence against him." *Lopez*, 437 F.3d at 1065; *see also Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998) (finding that misrepresentations of fingerprint evidence, "without more, do not render an otherwise voluntary confession involuntary"); *Frazier v. Cupp,* 394 U.S. 731, 739 (1969) (holding interrogator's misrepresentation to suspect that his co-suspect had already confessed did not render suspect's subsequent confession coerced).    Thus, in *Lopez*, the Tenth Circuit found that agents' misrepresentations of the evidence along with a promise of leniency were sufficient *together* to render a confession involuntary. *Lopez*, 437 F.3d at 1065. In *Young*, the Tenth Circuit looked so unfavorably upon Agent Brown's misrepresentation of the law because "[c]ourts are much less likely to tolerate misrepresentations of law." *Young*, 964 F.3d at 944. On the other hand, "[o]f the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." *Lucero*, 133 F.3d at 1311 (citing *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992)).   Finally, in the search and seizure context, the Tenth Circuit has noted that "[w]hen government agents seek an individual's cooperation with a government investigation by misrepresenting the nature of that investigation, this deception is appropriately considered as part of the totality of circumstances in determining whether consent was gained by coercion or duress." *United States v. Harrison*, 639 F.3d 1273, 1278–79 (10th Cir. 2011).

There is no question that Sergeant Rodriguez told various lies in the instant interrogation. First, as discussed *supra*, Sergeant Rodriguez lied about the nature of the investigation, denying that Mr. Pena was a suspect.  Doc. 54-2 at 6 ("I'm not accusing you. . . . I'm not accusing you of anything right now").  Additionally, Sergeant Rodriguez overstated the strength of the evidence, claiming he had overwhelming evidence of Mr. Pena's guilt.  Doc. 54-2 at 21 ("I have evidence that you can't believe that, that puts you in a very bad light."), 86 ("You did it and the evidence is going to destroy you, is going to destroy you."), 107 ("I have evidence that puts you there. . . . I have your DNA."), 114 ("I have evidence of a grave crime that you're going to go to jail for."). In reality, Sergeant Rodriguez later admitted that he had no DNA evidence linking Mr. Pena to the alleged act; nor had he necessarily reviewed *any* other evidence of the alleged crime.  Doc. 95 at 85:8 ("I have not watched the video"), 85:25–86:2 ("I did not [have DNA evidence]. That was a technique."), 86:19–20—87:1–2 ("I know there had been communications that were made . . . I don't know if I actually saw them or I actually was just told about them.").

As before, the Court finds Sergeant Rodriguez' conduct incompatible with the truth-seeking function of the criminal justice system.  Nevertheless, in light of clear Tenth Circuit precedent, the Court cannot find that Sergeant Rodriguez' misrepresentations rendered Mr. Pena's confession involuntary.  Although Sergeant Rodriguez misrepresented the strength of the evidence against Mr. Pena, such misrepresentations are readily countenanced by Tenth Circuit precedent. *See, e.g.*, *Lopez*, 437 F.3d at 1065; *Lucero*, 133 F.3d at 1311.

Additionally, although Sergeant Rodriguez initially lied about the nature of the investigation, he ultimately clarified that Mr. Pena was under investigation.  Doc. 54-2 at 95 (Mr. Pena: "No, so then I'm here because supposedly she reported that we had sexual relations, that's why."; Sergeant Rodriguez: "Ex, exactly."), 114 (Sergeant Rodriguez: "I'm telling you right now

that we're here today, José, because you are accused, and I have evidence of a grave crime that you're going to go to jail for."). Thus, even though Sergeant Rodriguez' initial deception was troubling, he ultimately allayed any prejudice he caused to Mr. Pena—long before Mr. Pena made an inculpatory statement.

Finally, Sergeant Rodriguez did not misrepresent the law or make any promise of leniency. *See Young*, 964 F.3d at 944; *Lopez*, 437 F.3d at 1065. Accordingly, the Court has no choice but to find that Sergeant Rodriguez' deceptions, "without more, do not render an otherwise voluntary confession involuntary." *Lucero*, 133 F.3d at 1311.

### ii.  Accusatory, Persistent Questioning

Mr. Pena argues that Sergeant Rodriguez engaged in aggressive, persistent questioning, exhorting Mr. Pena to be honest dozens of times while "alternating between a loud speaking voice, and at times, shouting." Doc. 51 at 2. He also draws on law from the search and seizure context to argue that "'[a]ccusatory, persistent, and intrusive' questioning can turn an otherwise voluntary encounter into a coercive one." Doc. 66 at 3 (citing *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995)).

The government characterizes the interrogation as "a persistent yet cordial interview." Doc. 54 at 8. The government also argues that in *United States v. Martine*, this Court did not penalize "the agent's interrogation strategy of repeatedly asking the same question because the agent believed the defendant not to be truthful." *Id.* at 10 (citing *United States v. Martine*, No. CR-04-2357 MV, 2005 WL 8163528, at *1 (D.N.M. Aug. 4, 2005) (Vázquez, J.)).

In *Martine*, this Court found:

> It is undisputed that Agent Ramirez repeatedly asked Defendant the same question about Emily despite Defendant's consistent denial of the allegations of sexual abuse. Agent Ramirez, however, testified that he continued to ask the same question because, based on Defendant's demeanor, Agent Ramirez believed that

13

Defendant was not being truthful.  Moreover, Agent Ramirez testified that, as he provided different "scenarios" to Defendant, Defendant became increasingly forthcoming.  Under these circumstances, Agent Ramirez's interrogation strategy does not amount to coercive police activity.

*Martine*, 2005 WL 8163528, at *6.

The instant case presents similar facts.  Sergeant Rodriguez repeatedly asked Mr. Pena whether he had had sexual relations with his daughter and used phrases like "be honest" and "tell the truth" nearly 100 times.  *See* Doc. 54-2.  Sergeant Rodriguez also testified that he employed this tactic because he believed that Mr. Pena was not being truthful.  *See, e.g.*, Doc. 95 at 59:3 ("I knew what he was telling me was a lie.").  Sergeant Rodriguez testified that he also employed this tactic because he felt that Mr. Pena was becoming increasingly forthcoming.  For example, he stated:

> I felt that it was important to continue the interview, and that I, you know, was making progress through the interview through our communication.  And little by little, like I said, he was making progress as well because he was giving me – he was making statements.

*Id.* at 30:25—31:1–4.  Sergeant Rodriguez pointed to Mr. Pena's statements like "I'm gonna go to jail anyway, things of that nature" to demonstrate why he felt the interrogation was progressing.  *Id.* at 72:24–25—73:1.

On the other hand, the Court disagrees with the government's characterization of the encounter as "cordial."  Doc. 54 at 8.  Sergeant Rodriguez had a "much louder" voice than anyone else involved.  Doc. 95 at 80:22–23.  Likewise, his tone was often skeptical, and the rapidity and length of his statements comes across as aggressive.  *See* Doc. 54-1.  Although Sergeant Rodriguez also made rapport-building statements to Mr. Pena that come across as friendly, the overall tone of the encounter was not "cordial."  Doc. 54 at 8; *see, e.g.*, Doc. 54-2 at 11 ("we're talking man to man"), at 12 ("I tell you that, what happened, happened").

Ultimately, the Court finds that Sergeant Rodriguez' accusatory, persistent questioning did not render Mr. Pena's statements involuntary.  Although the Tenth Circuit has often commented on the civility of an interview where it has found a confession voluntary, it has declined to impose a civility requirement.  *See, e.g.*, *United States v. Rodebaugh*, 798 F.3d 1281, 1292 (10th Cir. 2015) ("[T]he interview was not unduly long, especially in light of the agents' nonaggressive questioning."); *United States v. Lamy*, 521 F.3d 1257, 1262 (10th Cir. 2008) ("The officers never raised their voices."); *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998) ("[T]he officers were well-mannered and courteous and did not adopt a threatening posture or make a show of physical force.").  Thus, although the Court finds Sergeant Rodriguez' conduct uncivil, the Court follows existing case law to find that accusatory, persistent questioning is not an inherently coercive interrogation strategy.  *See Martine*, 2005 WL 8163528, at *6.

### iii.  Psychological Pressure

Mr. Pena argues that the involvement of his ex-wife, Maria Ramirez, in the interrogation amounted to coercion.  Doc. 51 at 3; Doc. 66 at 6; Doc. 97 at 13.  The government concedes that his "estranged wife likely did influence his decision to tell the truth."  Doc. 54 at 12.  However, the government argues that "her influence was non-government pressure and does not render his confession involuntary."  *Id.*  The government also argues that Ms. Ramirez was not trying to coerce Mr. Pena into confessing a crime, as her statements appear to indicate that she believed that he was acting under duress.  *Id.* (citing Doc. 54-2 at 128–29).

The Tenth Circuit has found that psychological coercion can render a confession involuntary.  For example, in *Griffin*, the interviewer made the following statement to the accused:

> Okay, well, you are going to be away from your daughter for a while. Cause I . . . believe the children.  And . . . in order for you to ever . . . have a relationship with your daughter again . . . then you're going to need to get some . . . extensive help . . . and . . . after that time, and only after that time . . . uh . . . would it be possible

> for you to be reunited with your daughter again.  And in order for you to . . . receive
> any help for the problem, you're going to have to admit there's a problem.

*Griffin*, 983 F.2d at 1541–42.  The Tenth Circuit held "as a matter of law that the type of

interrogation used here, and the threats upon which it relied, was so coercive as to render plaintiff's

statement involuntary."  *Id.* at 1542.

However, the Fifth Amendment is not "concerned with moral and psychological pressures

to confess emanating from sources other than official coercion."  *Oregon v. Elstad*, 470 U.S. 298,

304–05 (1985).  For example, in *Nickel v. Hannigan*, the Tenth Circuit determined that even

though a lawyer directed his client to go to the police station and informed the police that he

suspected that his client had engaged in criminal activity, the lawyer's actions did "not constitute

police coercion because [he was] not a member of the police, nor was he acting at the direction or

on behalf of the police."  97 F.3d 403, 411 (10th Cir. 1996).  Similarly, in *Erving L.*, where E.L.'s

mother told him "to cooperate with the investigation" in order to "clear his conscience" after he

"informed officers that he no longer wished to speak to them," the Tenth Circuit found that she

was not "acting on behalf of the officers or in any capacity other than a parental one."  147 F.3d at

1251.  Thus, "to the extent that E.L.'s will was overborne, it was overborne by the actions of his

parents rather than the actions of the officers," and his statements were therefore voluntary.  *Id.*

Here, Ms. Ramirez' statement is similar to the emotional appeal made in *Griffin*:

> Well, tell the truth, José.  Tell the truth because look how your daughter has
> suffered.  She's suffered a lot, she is suffering a lot, she wants to die.  Your son
> wants to kill himself too, he wants to hang himself.  We are all suffering.  You
> know how all of this is happening.  We are suffering a lot, José, because of all of
> this.  It's that you have to tell the truth, José, you have to tell.

Doc. 54-2 at 125; *Griffin*, 983 F.2d at 1542.  Though Ms. Ramirez did not hold out the hope of

reconciliation, her appeal was highly emotionally charged.  Moreover, the recording of the

interrogation reflects that Mr. Pena had a strong emotional response to this appeal and confessed

shortly thereafter.  *See* Doc. 54-1.  Accordingly, it is reasonable to conclude that Ms. Ramirez'

actions may have overborn Mr. Pena's will.  *Toles*, 297 F.3d at 965.

 The question is whether Ms. Ramirez was "acting at the direction or on behalf of the police"

when she made this statement.  *Nickel*, 97 F.3d at 411.  There is direct evidence on this issue.

During the interview, Sergeant Rodriguez told Mr. Pena:

> I brought her because I want you to see that see that I'm not playing around with
> you and that I'm not lying, that we didn't get up this morning with these falsehoods.
> We are talking to you with the truth and out of respect I would like you to respond
> with the truth.  That's why I brought her.  I didn't want to bring your wife in here
> but it's the only way you are going to believe that these things are serious and that
> we're not making them up, is hearing them from the mouth of a loved one, that's
> the only way.

Doc. 54-2 at 132–33.  Later, Sergeant Rodriguez elaborated on his purpose: "She was brought in

as part of the interview to explain to Mr. Pena that . . . it wasn't law enforcement who was making

these allegations up, that it had come from his daughter."  Doc. 95 at 73:8–11.  However, he also

stated that he had never spoken with Ms. Ramirez before that day and that he was not the detective

that brought her into the interrogation room.  *Id.* at 83:15,  95:16–18.  He also vehemently denied

that he would have coached her to participate in the interrogation.  *Id.* at 82:23–25 ("I don't have

a specific recollection, Your Honor, of exactly what we talked about.  But it was not any form of,

I need you to go in there and ask these answers.  I would never do that.").

 Indeed, when Ms. Ramirez first entered the room, she did exactly what Sergeant Rodriguez

said she was brought to do:

> Remember, my daughter . . . (clears throat) my daughter went to school and told
> them everything.  She told everything to the officer over there, the one from school.
> . . . She told everything to the officers over there and to the detective. . . . Regarding
> everything that's happened . . . everything, José.

Doc. 54-2 at 125.  Accordingly, because she specifically complied with Sergeant Rodriguez' stated purpose for her presence, the Court finds that Ms. Ramirez was acting at the direction of the police as she made this statement.  *Nickel*, 97 F.3d at 411.

However, it does not stand to reason that Ms. Ramirez continued to act "at the direction or on behalf of the police" as she continued talking to Mr. Pena.  *Nickel*, 97 F.3d at 411.  When she begged Mr. Pena to tell the truth, it appears that she was acting on behalf of her children.  Her statement "Tell the truth because look how your daughter has suffered" speaks to her reasonable parental concern for her daughter.  Doc. 54-2 at 125.  By explaining that her son and daughter were suicidal, Ms. Ramirez acted as a mother, attempting to protect her children, rather than as an agent of the police.  *Id.*  When she stated, "We are all suffering," she showed that she was self-motivated to act out of familial concern.  *Id.*  "This type of non-government pressure does not render a confession involuntary."  *Erving L.*, 147 F.3d at 1251.

As Ms. Ramirez continued to beg Mr. Pena to tell the truth, she further proved that she was not acting "at the direction or on behalf of the police."  *Nickel*, 97 F.3d at 411.  Namely, she stated:

> So say it, say it.  Because des [sic], they want to, they want to blame you, José. They want to blame you for the whole thing.  Right now they are going to send you to jail, they are going to put you in jail.

Doc. 54-2 at 126.   This statement shows that Ms. Ramirez had a dramatically different understanding of the case than Sergeant Rodriguez.  While Sergeant Rodriguez was intent on getting a confession that Mr. Pena had orchestrated an external threat in order to have sexual contact with his minor daughter, Ms. Ramirez was convinced that if Mr. Pena was truthful, the facts would show that he acted under duress.  *Id.*; Doc. 95 at 96:8–11.  Rather than assist law enforcement in extracting a confession, Ms. Ramirez was acting in the hope that Mr. Pena would exonerate himself.  Thus, again, her statements cannot be understood as governmental pressure.

Accordingly, the Court finds that "to the extent that [Mr. Pena's] free will was overcome, it was the actions of [Ms. Ramirez, acting independently,] that led to the confession." *Erving L.*, 147 F.3d at 1249.

### c. Length of Questioning

Mr. Pena's interview lasted 3 hours, 48 minutes, and 8 seconds. *See* Doc. 54-1 (Mr. Pena enters the room at 00:04:05 and leaves the room at 03:52:13). Although Mr. Pena characterizes the interview as "incredibly long," the government argues that the "Tenth Circuit and district courts within the Circuit have consistently upheld lengthy interviews in this same time range as not coercive." Doc. 54 at 8; Doc. 66 at 3.

In *Berghuis*, the Supreme Court found that "there is no authority for the proposition that an interrogation of [three hours] is inherently coercive." 560 U.S. at 387. In *Rodebaugh*, the Tenth Circuit found that a three-hour interrogation "was not unduly long." 798 F.3d at 1292. It did note, however, that this finding was made "in light of the agents' nonaggressive questioning." *Id.* In *United States v. Harris*, the Tenth Circuit found that a three-hour interrogation on Friday, followed by a two- to three-hour interrogation on Monday "in no way counterbalances all of the factors" showing that the statement was voluntary. 956 F.2d 279, *6 (10th Cir. 1992) (unpublished). In *Young*, the Tenth Circuit characterized a one-hour interview as "short." 964 F.3d at 945. Finally, in *United States v. Oldman*, the District of Utah found that a confession was voluntary where the defendant was "questioned but not detained for about 3 ½ hours." 156 F. Supp. 2d 1252, 1262–63 (D. Utah 2001).

Here, the Court finds that the length of Mr. Pena's interview was not so coercive as to render his statements involuntary, in light of Tenth Circuit precedent. *See Rodebaugh*, 798 F.3d at 1292; *Harris*, 956 F.2d at *6. However, the Court notes that interviews approaching or

exceeding four hours must be viewed with extreme skepticism.  As the Supreme Court has underscored, "slowly mounting fatigue does, and is calculated to, play its part," and interrogations extending beyond three hours could, in other circumstances, render a confession involuntary. *Spano*, 360 U.S. at 322.

### d.  Physical Punishment

Mr. Pena was not subjected to any form of physical punishment.  Sergeant Rodriguez gave Mr. Pena breaks, gave him an opportunity to use the bathroom, and offered him soda and water. Doc. 54-2 at 32, 90, 122, 136.  Thus, this factor weighs in favor of a finding that Mr. Pena's statements were voluntary.  *Lopez*, 437 F.3d at 1063–64.

### e.  Conclusion

Having considered the totality of the circumstances, the Court finds that Mr. Pena's interview was not so coercive as to render his statements involuntary.  This is not to say that the interrogation was not conducted to extract a confession.  However, in light of binding precedent, this Court has no choice but to find that Mr. Pena's statements were not coerced.

### 2.  Defendant's Mental Condition

After considering the details of the interrogation, the Court must "turn to other factors that may contribute to involuntariness, including the defendant's mental condition."  *Young*, 964 F.3d at 943.  Mr. Pena argues that "[e]verything that the officer did was designed to play off of Mr. Pena's weaknesses."  Doc. 51 at 6.  In support of this, Mr. Pena contends that he is a middle-aged Mexican man with a limited educational background and limited contact with the US criminal justice system.  *Id.* at 3, 6.  The government responds that Mr. Pena "reported having completed his education through the sixth grade."  Doc. 54 at 6.  The government also contends that Mr. Pena was found competent to stand trial in state court and was found to have "executive functioning and

cognitive flexibility skills . . . indicating that he was capable of learning and retaining legal and factual information." *Id.*; *see also* Doc. 54-3. Finally, the government responds that Mr. Pena "has spent the last 20 years living in New Mexico." Doc. 54 at 6.

"[T]he Tenth Circuit has consistently declined to find a confession involuntary, regardless of the unique physical or mental characteristics of a particular defendant, absent police conduct amounting to coercion, improper inducement or the exploitation of a known mental condition or defect." *Martine*, 2005 WL 8163528, at *5; *see also Lamy*, 521 F.3d at 1260–62 (finding that even where defendant flunked out of the eighth grade, was "functionally illiterate," had an "ability to integrate information . . . at the retarded level," and was "psychologically inclined to acquiesce to authority figures," defendant's background did not weigh in favor of suppression where the interviewer "testified that [defendant] appeared to understand him at all times, and that they had no communication problems."); *Erving L.*, 147 F.3d at 1249 (providing that "[defendant's] age, mental capacity, and personal idiosyncrasies are relevant only if this court first concludes that the officers' conduct was coercive," and concluding that given the officers' courteous and non-threatening behavior, the confession of a thirteen year old with a borderline IQ was voluntary).

Here, the Court finds that Mr. Pena was not particularly susceptible to coercion. First, Mr. Pena's age and education do not show that he was particularly susceptible. Mr. Pena was an adult. *See, e.g.*, *Oldman*, 156 F. Supp. 2d at 1263 ("Oldman's confession was voluntary and intelligent. He is an adult . . ."). Likewise, his education, while abbreviated, is not atypical of defendants found to have made voluntary statements. *See, e.g.*, *United States v. Woody*, No. CR 18-3902 JB, 2020 WL 3513486, at *26 (D.N.M. June 29, 2020) ("Woody's background and education do not suggest he was unusually susceptible to coercion. Woody has an eighth-grade education, but he appeared capable of answering Zuercher and McCaskill's questions."). Additionally, despite

Sergeant Rodriguez' limited command of Spanish, Mr. Pena "appeared to understand [Sergeant Rodriguez] at all times, and . . . they had no communication problems." *See Lamy*, 521 F.3d at 1260–62; Doc. 54-2 at 2 ("Officer[s] conducting the interview are not native Spanish speakers. Many words are not said correctly.").  Finally, to the extent that Mr. Pena's childhood in Mexico affected his attitude towards the U.S. criminal justice system, this factor is irrelevant to the voluntariness analysis.  *See, e.g.*, *United States v. Zapata*, 997 F.2d 751, 759 (10th Cir. 1993) ("[E]ven assuming some subjective characteristics are relevant to the validity of Mr. Zapata's consent, we reject the notion that his attitude toward police, from whatever source, can constitute . . . a relevant subjective characteristic.").  Accordingly, the Court finds that Mr. Pena's statements were voluntary and are therefore not subject to suppression.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that Mr. Pena's Motion to Suppress Statements [Doc. 51] is **DENIED**.


ENTERED this 18th day of April 2022.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE